# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LEVETTE N. DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15-cv-05542 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ESA MANAGEMENT, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Levette Davis claims that her former employer, Defendant ESA Management, LLC ("ESA"), fired her because of her race and disabled status, retaliated against her for filing a charge of discrimination with the Equal Opportunity Commission ("EEOC"), and denied her requests for medical leave in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654. Now before the Court is ESA's motion for summary judgment. (Dkt. No. 46.) For the reasons explained below, the motion is granted.

## BACKGROUND

### I.  Procedural History

Before proceeding to the merits, a brief summary of the relevant proceedings leading to this point is warranted. Davis filed this lawsuit on June 22, 2015. At the time, she was represented by retained counsel. Approximately a year later, ESA filed a motion for summary judgment. Davis's retained counsel discussed the summary judgment motion with her, and the two disagreed on how to proceed. Consequently, Davis's counsel filed a motion to withdraw as her attorney, advising the Court that he could not in good faith respond to the summary judgment motion consistent with his obligations under Federal Rule of Civil Procedure 11. Subsequently,

Davis filed a motion to proceed *in forma pauperis*. The Court granted that motion and appointed *pro bono* counsel to represent Davis for purposes of summary judgment and any resulting proceedings. At the next status hearing, however, Davis's recruited counsel also informed the Court that she could not in good faith respond to the summary judgment motion and she moved to withdraw. The Court granted her request. No other counsel was recruited for Davis, and so she filed a *pro se* appearance. The Court also struck the previously-filed summary judgment motion and entered a new dispositive motion scheduling order.

ESA filed its renewed motion for summary judgment in accordance with the Court-ordered schedule. The motion was supported by a statement of undisputed material facts as required by Federal Rule of Civil Procedure 56(c) and Local Rule 56.1. (Dkt. Nos. 46, 48.) Davis subsequently submitted a "response," which she describes in the cover page as her "summary judgment for my documents that I'm submitting to support my case. Attached is proof of pictures and documents." (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1, Dkt. No. 49.) The "response" includes over 900 pages documents, some of which would potentially be admissible at trial but many that would not. According to Local Rule 56.1, a party opposing a summary judgment motion must file a concise response to the movant's statement of facts that contains "numbered paragraphs, each corresponding to and stating a concise summary of the paragraph [in the moving party's statement of facts] to which it is directed." N.D. Ill. Local R. 56.1(b)(3)(A). The opposing party must also include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* at 56.1(b)(3)(B). If the non-movant wants to present facts additional facts, she must submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment,

including references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* at 56.1(b)(3)(C). That statement of additional facts must be limited to 40 separately-numbered paragraphs. If the non-movant does not respond to the movant's statement of facts, a court deems the movant's statement admitted. *Id.*

Davis's "response" does not comply with any of the requirements of Rule 56.1. Instead, she has submitted over 900 pages of supporting evidence for the Court to sift through. But nothing in those documents could be construed as an attempt to rebut directly the statement of facts submitted by ESA. At best, the documents constitute an attempt to submit additional facts. However, the Court's review of the documents revealed little material, admissible information. Most of the documents are confusing or from unknown origin. For example, Davis submits a number of emails she appears to have written to herself. Those notes are not only difficult to understand but also would be inadmissible hearsay. Ultimately, because Davis has failed to submit a response to ESA's statement of facts that complies with Rule 56.1, ESA's factual statements are deemed admitted for purposes of the present motion. Fed. R. Civ. P. 56(e)(2); L.R. 56.1(b)(1)(C) (N.D. Ill.); *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The following factual summary is therefore taken from ESA's Rule 56.1 statement to extent the facts are supported by the record.

## II. Undisputed Facts

For ten years, Davis worked as a housekeeper at various ESA properties in Michigan and Illinois. (Def.'s R. 56.1 Stmt. ¶ 4, Dkt. No. 48.) Then, on September 9, 2013, Davis accepted a transfer to ESA's Hanover Park hotel. She started working at the Hanover Park hotel about a week later. (*Id.*) Cheryl Studer, the hotel manager, and Edna Calaustro, the housekeeping team lead, were Davis's supervisors at Hanover Park. (*Id.*) According to Studer, ESA thoroughly

3

trains its new housekeepers and periodically retrains the housekeeping staff. (*Id.* ¶ 5.) ESA also provides a training manual to its housekeeping staff that outlines housekeeping duties and responsibilities. (*Id.* ¶ 5.) Housekeepers at Hanover Park arrive at 9:00 a.m. to begin their shifts and use an electronic timekeeping "punch" system to record their start and end times. (*Id.* ¶ 6.)

During the relevant time period, when housekeepers arrived at work, Calaustro or Studer would provide them with assignment sheets listing each room they were assigned to clean and the type of cleaning service needed for each room. (*Id.*) The amount of time that housekeepers were expected to spend cleaning each room varied depending on how the room was designated on the assignment sheet. If a room was labeled "Daily Check Out Service," the guest stayed at the hotel between one and six nights and the housekeeper was expected to clean the room fully in 30 minutes or less. (*Id.* ¶ 7.) If a room was labeled "Weekly Check Out Service," the guest stayed for seven nights or more and the housekeeper was expected to clean the room fully in 60 minutes or less. (*Id.*) If the room was labeled "Stayover Service," the guest had not checked out and the housekeeper was expected to clean the room fully in 25 minutes or less. (*Id.*) If the housekeeper discovered that a particular room required more than the designated amount of time to clean, she was supposed to contact Calaustro or Studer to request additional cleaning time. (*Id.* ¶ 8.) Calaustro and Studer would then inspect the room and determine whether additional time was necessary. (*Id.*) When a housekeeper finished cleaning a room, she was supposed to put her initials next to the room number on the assignment sheet to indicate that the room had been cleaned. Housekeepers returned those sheets to Calaustro or Studer at the end of the day, and Calaustro and Studer used them to account for the total time each housekeeper spent cleaning. (*Id.* ¶ 9.) Occasionally, Calaustro or Studer would conduct room inspections to ensure that the housekeeping staff was meeting ESA's standards and expectations for cleaning rooms. (*Id.* ¶ 10.)

Shortly after starting work at ESA's Hanover Park location, Davis began receiving complaints and negative evaluations related to her cleaning services. On October 2, 2013, a guest staying in one of the rooms to which Davis was assigned complained that his room had not been properly cleaned. (*Id.* ¶ 13.) On October 10, 2013, Studer conducted room checks for rooms to which Davis was assigned that day and found that eight of the rooms cleaned by Davis did not meet ESA's housekeeping standards. (*Id.* ¶¶ 11, 12.) In one room, for example, Studer found that the inside of the refrigerator had a strong odor, a cooking pot was missing from the kitchen, the sugar caddie had not been properly refilled, and the toilet would not flush. (*Id.* ¶ 11.) On October 26, 2013, a guest checked into a room and complained that it was dirty. (*Id.* ¶ 14.) Davis was the last person assigned to clean the room. (*Id.*) On October 28, 2013, Studer again conducted room inspections and found that many of the rooms Davis cleaned did not meet ESA's standards. (*Id.* ¶ 15.) For example, in one room Studer found that the nightstand had not been cleaned, there were visible crumbs on the kitchen table, and the washcloths and towels in the bathroom had not been replaced. (*Id.* ¶ 15.) In a letter dated October 29, 2013, Studer listed each room Davis had not properly cleaned and directed Calaustro to tell Davis to go back and properly clean those rooms. (*Id.* ¶ 16.)

Yet despite the reprimand, guests continued to complain about the cleanliness of rooms cleaned by Davis throughout December. (*Id.* ¶ 18–20.) Indeed, on one occasion, a guest complained that her room had not been cleaned, and when Studer went to look for Davis, she found Davis's housekeeping cart unattended in the hallway and the door to a guestroom propped open with the dead-bolt security lock. Davis, however, was nowhere to be found. Studer eventually learned that Davis had taken her break off-property without informing anyone or clocking out. (*Id.* ¶¶ 21, 22.) When Davis returned, Studer reprimanded her for taking a break

5

without notice and for leaving a guestroom open. (*Id.* ¶ 23.) After the conversation, Davis demanded to speak with Jay Sandifer, ESA's District Manager and Studer's direct supervisor. (*Id.* ¶ 24.) On December 31, 2013, Studer, Sandifer, and Davis met. At the conclusion of the meeting, Studer and Sandifer issued a formal counseling report to Davis for "insubordination and overall job performance." (*Id.* ¶ 26.)

After this meeting, guests continued to complain about the cleanliness of rooms assigned to Davis. (*Id.* ¶¶ 31–36, 43.) Additionally, when Studer conducted room inspections, she continued to find issues with the cleanliness of Davis's rooms. (*Id.* ¶¶ 38, 41.) Studer repeatedly advised Davis that she needed to improve her performance. (*Id.* ¶¶ 37, 39, 42.) Eventually, after Davis's performance did not improve and guests continued to complain, Studer decided to place Davis on a performance improvement process ("PIP"). On February 19, 2014, Studer explained to Davis that she had failed to address numerous performance issues and required her to complete an action plan to explain how she would address the performance issues. (*Id.* ¶ 46.) The action plan was due February 25, 2014. (*Id.* ¶ 46.) Despite several reminders from Studer, Davis never completed and turned in her action plan. (*Id.* ¶ 47.) And although Davis was placed on a PIP, her performance did not improve—guests continued to complain about their rooms and, during her inspections, Studer continually found problems. (*Id.* ¶¶ 48, 52.) The cleanliness issues continued through March and April. (*Id.* ¶¶ 55–59.)

As Studer started to supervise Davis more closely, she noticed that Davis would routinely report longer hours than those to which she was assigned. (*Id.* ¶ 27.) For example, on January 6, 2014, Davis was assigned to clean seven rooms at 30 minutes each, totaling approximately 3.5 hours of cleaning. (*Id.* ¶ 28.) Instead, however, Davis recorded 5.5 hours of work. (*Id.*) Additionally, Davis was often late for work. On January 19, 2014, for example, Davis was

6

supposed to come into work at 10:00 a.m. (after requesting to arrive an hour late). At 10:40 a.m., Davis called the hotel and said she would arrive in 20–30 minutes. At 11:28 a.m., 90 minutes late, Davis clocked into work. (*Id.* ¶ 29.) On March 18, 2013, Studer discussed this timeliness issue with Davis, and the two came to a compromise—Davis would start at 9:30 a.m. instead of 9:00 a.m. Despite this accommodation, Davis continued to show up late for work. (*Id.* ¶ 56.)

The final straw came on April 21, 2014. Davis was scheduled to start work at 9:30 a.m. that day, according to her compromise with Studer. Nonetheless, at 9:50 a.m., Davis called the hotel and informed the front desk receptionist that she was late due to a personal issue and would arrive at work by 11:00 a.m. (*Id.* ¶ 60.) Apparently, Davis had parked without the proper sticker or parking identification, and as a result she had to recover her car before she could drive to work. Davis eventually arrived for her shift at 11:33 a.m—two hours late. (*Id.* ¶ 61.) At that point, Studer decided to terminate Davis because of her continued performance issues. (*Id.* ¶ 63.) And so, on April 24, 2014, Studer sent Sandifer a termination notice for Davis. (*Id.*) Sandifer e-mailed Anne Torres, the Divisional Director of Human Resources, recommending termination. (*Id.* ¶ 64.) Torres told Sandifer that the hotel could proceed with the termination. (*Id.* ¶ 65.)

That same day, Studer received a fax from the EEOC with a charge of discrimination filed by Davis. Davis's charged alleged, among other things, that ESA had discriminated against Davis based on her race and disability. (*Id.* ¶ 65.) Davis is black and, according to her EEOC intake form, has a learning disability, but it has not "affected [her] at [her] work in any type of way." According to Davis, her manager did not know about her disability (*Id.* ¶¶ 65, 68.) Neither Studer, Sandifer, nor Torres had any knowledge of the EEOC charge before deciding to terminate Davis. (*Id.* ¶ 66.) On April 25, 2014, Davis was formally terminated. (*Id.* ¶ 67.)

7

In her complaint, Davis also alleges that ESA denied her requests for time off under FMLA. During discovery, Davis revealed that the last time she requested time off from work under FMLA was in or around 2006, or possibly 2007 or 2008, when she broke her ankle. (*Id.* ¶¶ 71, 72.)

**DISCUSSION**

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the nonmovant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). In this case, ESA has moved for summary judgment on all of Davis's claims, which are as follows: (1) ESA discriminated against Davis based on her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) ESA retaliated against Davis for filing a charge of discrimination with the EEOC; (3) ESA denied her request for medical leave under FMLA; and (4) ESA discriminated against Davis based on her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.

### I.     Race Discrimination Claim

In assessing a race discrimination claim, courts in this Circuit consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In applying this legal standard, the Court must consider evidence as a whole, "rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* In this case, however, David has not presented any evidence that ESA's actions toward her were motivated by her race.

To begin, there has been no evidence presented here of "an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Nor is there any other record evidence pointing to a racially-discriminatory motive behind ESA's actions. It appears that Davis's best hope for surviving summary judgment would be to invoke the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action; and (4) similarly-situated employees outside of her protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that initial burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is actually pretextual. *Id.* The plaintiff must produce evidence in response to the motion and cannot rely on his pleadings. *Hummel v. St. Joseph County Bd. of Com'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). The initial burden and pretext inquiries often overlap and may be considered together when the same factual issues relate to both. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010).

To make the necessary showing of similarly-situated comparators, a plaintiff must demonstrate that the proffered comparators dealt with the same supervisor, were subject to the same employment standards, and engaged in similar conduct as did the plaintiff. *See Harper v.*

*C.R. England, Inc.*, 687 F.3d 297, 309–10 (7th Cir. 2012). Here, Davis has failed to offer evidence from which a reasonable jury could conclude that similarly-situated, non-black employees were treated more favorably than she was treated. Specifically, Davis has failed to identify other housekeepers who had comparable issues with tardiness, time-management, and work quality. Indeed, as far as the Court has been able to discern from her 900-plus page response, Davis does not identify any other employees, let alone ones with a similar set of failings. As a result, Davis has failed to establish the existence of similarly-situated employees for the purpose of her discrimination claim. In the absence of evidence of similarly-situated employees who received better treatment, Davis has fallen short of her burden of showing discrimination and cannot survive summary judgment on her discriminatory termination claim. *Simpson*, 827 F.3d at 661; *Henry v. Jones*, 507 F.3d 558, 565–66 (7th Cir. 2007).

Davis also cannot establish that she performed reasonably at her job and met her employer's legitimate expectations. To determine whether Davis was meeting her employer's legitimate expectations, "[t]he proper inquiry mandates looking at [Davis's] job performance through the eyes of her supervisors at the time" of her termination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). ESA has produced evidence that Davis did not meet her supervisors' expectations in at least the following ways: (1) by failing to clean hotel rooms according to both ESA and guest standards; (2) by consistently arriving late for work; (3) by taking longer than the allotted time to clean rooms; and (4) by propping a guest's door open, leaving the room unattended and exposed to theft.

During her deposition in this matter, Davis offered a number of explanations and arguments in response to ESA's evidence of her poor work performance. First, regarding her purported failure to clean rooms according to ESA and guest standards, Davis asserted that she

always did a good job (Def.'s R. 56.1 Stmt. Ex. A, Davis Dep. at 84:11–12, Dkt. No. 48), and that any guests who complained probably did so because of her skin color (*id.* at 80:20–21). Davis also indicated that after she cleaned certain rooms, the night auditor would allow non-guests to stay overnight in the empty bedrooms. Thus, when actual guests came to stay in the rooms for which Davis was responsible, the rooms would not be clean. (*Id.* at 83:6–15.) Davis also claimed that she would occasionally be called to a different site in the middle of her shift, and therefore she was not responsible for the rooms she could not finish. (*Id.* at 246:6–8, 321:16–18.) Those are just some of the many explanations provided by Davis to counter the evidence of her poor cleaning work. But none of her claims is supported by admissible evidence other than her own conclusory and often speculative deposition testimony. Next, as for ESA's proffered evidence of her tardiness, Davis responds that she was never late for work but instead she was working as a "floater" and so she would get sent to different sites at different times. (*Id.* at 42:14–19; 282:2–6.) According to Davis, before her 9:30 a.m. compromise with Studer, she was never given a defined start time due to her floater status. (*Id.* at 282:7–20.) After she was told to start coming to work at 9:30 a.m., she arrived on time but the time-clock was broken and would fail to record her timely arrival. (*Id.* at 283:1–6.) Davis did not produce any evidence to substantiate any of these claims, however. Finally, as to her taking too long to clean rooms, Davis claims that ESA frequently labeled 60-minute rooms as 30-minute rooms. (*Id.* at 67:18–20.) But again, she has not provided any evidence of any such a practice other than her own testimony. Finally, as to the proffered evidence that she propped open a guestroom door, Davis flatly denied that she left the door open. (*Id.* at 147:1–7.)

"Although a nonmoving party's own deposition may constitute affirmative evidence to defeat summary judgment, conclusory statements in the deposition do not create an issue of

11

fact." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Here, Davis attempts to manufacture issues of fact through speculation and conjecture. ESA has provided ample evidence that Davis was not meeting employment expectations—including affidavits, timesheets, and documentation of repeated warnings sent to Davis regarding her performance. Davis's attempts to create a question of fact are insufficient to support her allegations of discriminatory conduct.

In sum, Davis has failed to support her claims of a discriminatory motive for her termination. On this record, no reasonable juror could return a verdict in her favor on her race discrimination claim.

## II.     Retaliation Claim

Davis further claims that she was retaliated against for filing a complaint with the EEOC. Where, as here, the record is devoid of evidence akin to a defendant's admission of a discriminatory motive for an employment action, the plaintiff must show that (1) she engaged in statutorily-protected expression by complaining about prohibited discrimination; (3) she suffered an adverse impact by her employer; and (3) there is a causal link between the protected expression and the adverse job action. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). If the plaintiff makes this showing, the burden then shifts to the defendant to demonstrate a non-discriminatory reason for the adverse action. If the defendant demonstrates a non-discriminatory motive, the plaintiff must present evidence that the stated reason is pretextual. *Id.* at 1007–08.

In this case, Davis filed her first charge of discrimination with the EEOC on or about April 8, 2014. However, the undisputed evidence shows that ESA only learned about Davis's EEOC charge on April 24, 2014, several hours after Sandifer requested approval to terminate Davis. Additionally, ESA has produced evidence that Torres, the Divisional Director of Human

Resources, was unaware of the EEOC charge when she ultimately approved the termination. "An employer must have actual knowledge of the employee's protected activity to state a claim for retaliation." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012). Davis has not shown that her supervisors were aware that she had filed a charge of discrimination with the EEOC when they decided to terminated her. This dooms her retaliation claim.

### III.  FMLA Claim

Davis also contends that ESA improperly denied her requests for leave under FMLA. Generally, a plaintiff must bring a FMLA claim "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). However, a FMLA claim "may be brought within 3 years of the date of the last event constituting the alleged violation" if the violation was "willful." *Id.* § 2617(c)(2). Davis testified at her deposition that her only request for leave due to a medical condition occurred in or around 2006, or possibly 2007 or 2008. At the latest then, even assuming Davis has proven willfulness, her FMLA claim would have to have been filed by 2011. Davis filed her complaint on June 22, 2015. Accordingly, her claim is untimely and ESA is entitled to summary judgment.

### IV.  Disability Discrimination Claim

Finally, Davis claims that ESA discriminated against her because of her disability. To prevail on her disability discrimination claim, Davis must show that (1) she is disabled within the meaning of the ADA; (2) she can perform the essential functions of her job, with or without accommodation; and (3) ESA took an adverse employment action against her because of her disability or without making a reasonable accommodation for it. *Basden v. Professional Trans., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). The ADA defines disability as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such

individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Here, Davis testified that she was born with a learning disability but has provided no record or diagnosis of her impairment. Even if Davis had proven the existence of a disability, she stated on her EEOC intake questionnaire that her alleged disability has not affected her work at ESA in any type of way. Further, Davis stated in her EEOC intake questionnaire that her managers did not know about her disability. Nor has Davis presented any evidence that ESA did know about her disability. An employer cannot fire an employee *because* of a disability if they do not know that the employee has one. *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995). Consequently, Davis also cannot prove that ESA took an adverse employment action against her because of her disability. For these reasons, summary judgment is granted in ESA's favor on Davis's claim of discrimination under the ADA.

## CONCLUSION

In sum, the record before the Court fails to present a genuine dispute of material fact as to Davis's claims of race and disability discrimination, retaliation, or violation of FMLA. Accordingly, ESA's motion for summary judgment (Dkt. No. 46) is granted. The Clerk shall enter Judgment in favor ESA on all counts.

ENTERED:

Dated: April 9, 2018

_____
Andrea R. Wood
United States District Judge